COMMERCE AND INDUSTRY INSURANCE COMPANY v
DEPARTMENT OF TREASURY

Docket No. 311104. Submitted April 3, 2013, at Lansing. Decided June 6,
   2013, at 9:00 a.m. Leave to appeal sought.

   Commerce and Industry Insurance Company (C&I), a New York
      corporation, brought an action in the Court of Claims against the
      Department of Treasury, seeking a tax refund of $2,787,358 for tax
      year 2003. Noting that Michigan's retaliatory tax, MCL 500.476a,
      imposes a tax on foreign insurers approximately equal to the
      burden imposed by the foreign state (in this case, New York) on a
      Michigan insurer, C&I contended that three separate payments
      made by insurers to the former New York Workmen's Compensa-
      tion Board (now the New York Workers' Compensation Board)
      should have been excluded from calculating the burden imposed by
      New York, thereby reducing C&I's obligation under the Michigan
      retaliatory tax. Related cases involving AIU Insurance Company
      and American Home Assurance Company were consolidated, and
      those companies sought tax refunds for 2003 using the same
      theory as C&I. The three separate New York statutory assess-
      ments were a workers' compensation board assessment under
      former NY Workers' Comp 151(2)(b), which covered the adminis-
      trative expenses of the board; a special disability fund assessment
      under former NY Workers' Comp 15(8)(h), which financed a
      special fund for previously injured workers; and a reopened cases
      fund assessment under former NY Workers' Comp 25-a(3), which
      financed a special fund for certain stale claims filed after a delay.
      Plaintiffs claimed that these three New York assessments should
      not be included as part of Michigan's retaliatory tax because they
      were not burdens on insurance companies doing business in New
      York. Plaintiffs moved for summary disposition, which the court,
      Rosemarie E. Aquilina, J., granted. The court concluded that the
      three assessments were actually imposed on policyholders, not the
      insurers themselves, and that the practical effect of the New York
      schemes was that insurers were ultimately responsible only for the
      administrative task of remitting to the board the surcharge
      received from policyholders, so the assessments were not a burden
      on the insurers. The court further concluded that even if the three
      assessments were burdens for purposes of the retaliatory tax, they

were excluded from the retaliatory tax calculation by MCL 500.134(5), which provides that charges in a foreign state similar to charges in Michigan for associations or facilities are excluded from the retaliatory tax calculation. Defendant appealed.

The Court of Appeals *held*:

1. A retaliatory tax is a tax imposed by a state on foreign corporations, usually insurers, when the foreign state imposes a higher aggregate tax burden on actual or hypothetical out-of-state corporations. The purpose of a retaliatory tax is to encourage states to impose equal tax burdens on all insurance companies, whether foreign or domestic, thereby promoting interstate business. Under MCL 500.476a, if an insurer's state of incorporation imposes a larger aggregate tax burden on a Michigan insurer doing business in that state than Michigan imposes on a company from that state doing business in Michigan, the foreign insurer must pay to Michigan a tax equal to the difference in the aggregate tax burdens. Thus, to compute the retaliatory tax due from a foreign insurer, Michigan tallies all the taxes, fines, penalties, and other burdens it otherwise imposes on the foreign insurer doing business in Michigan. It then tallies the burden a hypothetical Michigan insurer would pay to that insurer's home state were the hypothetical Michigan insurer doing the same amount of business there. If the other state's total burden on the hypothetical Michigan insurer doing the same amount of business in that state would be larger than the burden Michigan imposed on the foreign insurer, the actual burden Michigan imposes is subtracted from the other state's burden on the hypothetical insurer, and the difference is the retaliatory tax the foreign insurer owes Michigan.

2. MCL 500.134(5) provides that any premium or assessment levied by an association or facility, or any premium or assessment of a similar association or facility formed under a law in force outside this state, is not a burden or special burden for purposes of a calculation under MCL 500.476a, and any premium or assessment paid to an association or facility is not included in determining the aggregate amount a foreign insurer pays under MCL 500.476a. MCL 500.476a(6) defines "association or facility" as an association of insurers created under the Insurance Code, MCL 500.100 *et seq.*, and any other association or facility formed under that act as a nonprofit organization of insurer members, including the Michigan Worker's Compensation Placement Facility created under MCL 500.2301 *et seq.* Those entities are essentially associations, organizations, or pools of insurers. Payments to them are not part of the Michigan burden on foreign insurers, and such

payments required by other states cannot be considered part of those states' burden when calculating retaliatory taxes.

3. Each of the New York statutes at issue specifically provided that the three charges were to be assessed on and collected from insurers like plaintiffs, but all insurance carriers had to collect the assessments from their policyholders through a surcharge. In other words, under the plain language of the statutes, there were two separate payments: one from the insurer to the state (the assessment) and another from the policyholder to the insurer (the surcharge). During the tax years at issue in this case, the assessments paid by insurers were separate from the surcharges paid by policyholders. Neither the assessment calculation nor the surcharge calculation guaranteed that assessments would equal surcharges. As a result, neither calculation connected an insurer's liability to the workers' compensation board for assessments with that insurer's collection of the same level of funds in surcharges from its policyholders. Additionally, the insurer's obligation to pay assessments to the board did not depend on the amount of surcharges separately collected by that insurer. Assessments and surcharges are conceptually and legally different, especially when assessments and surcharges are calculated by entirely different procedures. MCL 500.476a(1) provides that the retaliatory tax applies to the extent that a burden is imposed on an insurer by a foreign state. The New York statutes, however, provide that either the workers' compensation board or the board's chair imposed the assessments on insurers, and then insurers placed surcharges on policyholders so that the insurers could recover what they paid in assessments. Moreover, the assessments were imposed on the insurers themselves, not the policyholders. Consequently, the retaliatory tax applied to the entire amount of the assessments placed on insurers under those New York statutes. The trial court erred by concluding that MCL 500.134(5) and (6) operated to exclude the three assessments from the aggregate burdens imposed by New York.

4. With respect to MCL 500.134(5), which provides that any premium or assessment of a similar association or facility of a foreign state is not a burden or special burden for purposes of a calculation under MCL 500.476a, "similar" is commonly understood to mean having qualities in common. Thus, under the plain language of MCL 500.134(6), the New York burdens must have been imposed by (1) associations or facilities that (2) have qualities in common with the Michigan associations or facilities described. Because the New York entities were neither associations of insurers nor groups of insurers, and because the New York and

Michigan entities did not share sufficient common qualities, they were not similar for purposes of MCL 500.134(5). Plaintiffs argued that the assessment by the Michigan Worker's Compensation Placement Facility was similar to the three New York assessments because they have the effect of lowering the costs of otherwise uninsurable persons. The placement facility is a nonprofit organization of insurers that was statutorily created primarily to provide workers' compensation insurance to uninsurable employers and encourage maximum use of the private insurance system. The New York funds do not have those purposes.

5. The retaliatory tax scheme did not violate the equal protection provisions of the state and federal constitutions or the Dormant Commerce Clause.

Reversed and remanded for entry of an order granting summary disposition in defendant's favor.

1. TAXATION — RETALIATORY TAX — INSURANCE — CALCULATION.

A retaliatory tax is a tax imposed by a state on foreign corporations, usually insurers, when the foreign state imposes a higher aggregate tax burden on actual or hypothetical out-of-state corporations; under MCL 500.476a, if an insurer's state of incorporation imposes a larger aggregate tax burden on a Michigan insurer doing business in that state than Michigan imposes on a company from that state doing business in Michigan, the foreign insurer must pay to Michigan a tax equal to the difference in the aggregate tax burdens; to compute the retaliatory tax due from a foreign insurer, Michigan tallies all the taxes, fines, penalties, and other burdens it otherwise imposes on the foreign insurer doing business in Michigan and then tallies the burden a hypothetical Michigan insurer would pay to that insurer's home state were the hypothetical Michigan insurer doing the same amount of business there; if the other state's total burden on the hypothetical Michigan insurer doing the same amount of business in that state would be larger than the burden Michigan imposed on the foreign insurer, the actual burden Michigan imposes is subtracted from the other state's burden on the hypothetical insurer, and the difference is the retaliatory tax the foreign insurer owes Michigan.

2. TAXATION — RETALIATORY TAX — INSURANCE — PREMIUMS AND ASSESSMENTS BY ASSOCIATIONS AND FACILITIES.

MCL 500.134(5) provides that any premium or assessment levied by an association or facility, or any premium or assessment of a similar association or facility formed under a law in force outside this state, is not a burden or special burden for purposes of a

calculation under the retaliatory tax provision, MCL 500.476a, and any premium or assessment paid to an association or facility is not included in determining the aggregate amount a foreign insurer pays under that statute; MCL 500.476a(6) defines "association or facility" as an association of insurers created under the Insurance Code, MCL 500.100 *et seq.*, and any other association or facility formed under that act as a nonprofit organization of insurer members; "similar" means having qualities in common; payments to those entities are not part of the Michigan burden on foreign insurers, and such payments required by other states cannot be considered part of those states' burden when calculating retaliatory taxes.

3. TAXATION — RETALIATORY TAX — INSURANCE — ASSESSMENTS AND SURCHARGES.

The retaliatory tax provision, MCL 500.476a(1), provides that the retaliatory tax applies to the extent that a burden is imposed on an insurer by a foreign state; assessments and surcharges under insurance statutes are conceptually and legally different, especially when assessments and surcharges are calculated by entirely different procedures; the retaliatory tax applies to the entire amount of the assessments placed on insurers by a foreign state if the statutory scheme provides for both an assessment paid by the insurer to the state and a surcharge paid by the policyholder to the insurer, the assessments paid by the insurers are separate from the surcharges paid by policyholders, and neither the assessment calculation nor the surcharge calculation guarantees that assessments will equal surcharges, that is, neither calculation connects an insurer's liability for assessments with that insurer's collection of the same level of funds in surcharges from its policyholders and the insurer's obligation to pay assessments does not depend on the amount of surcharges separately collected by that insurer.

*Miller Canfield Paddock and Stone, P.L.C.* (by *Gregory A. Nowak* and *Jackie J. Cook*), and *Sidley Austin LLP* (by *Tracy D. Williams, Peter D. Edgerton*, and *William M. Sneed*) for plaintiffs.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Richard A. Bandstra*, Chief Legal Counsel, and *Kevin T. Smith*, Assistant Attorney General, for defendant.

Before: M. J. KELLY, P.J., and CAVANAGH and MURRAY, JJ.

MURRAY, J. The question presented in this appeal is whether certain assessments placed upon insurance companies doing business in New York constitute a "burden" upon the insurance companies for purposes of Michigan's retaliatory tax. For the reasons that follow, we conclude that they do, and we therefore reverse the trial court's order granting plaintiffs' motion for summary disposition and remand for entry of an order granting defendant summary disposition of plaintiffs' complaint.

## I. FACTS AND PROCEEDINGS

Plaintiff Commerce and Industry Insurance Company (C&I), a New York corporation, filed its complaint against defendant, the Michigan Department of Treasury (the department), seeking a tax refund of $2,787,358 for tax year 2003. In its complaint, C&I explained that Michigan's retaliatory tax imposes a tax on a foreign insurer approximately equal to the burden imposed by the foreign state (here, New York) on a Michigan insurer. C&I contended that three separate payments made by insurers to the former New York Workmen's Compensation Board, now the New York Workers' Compensation Board (the board), should be excluded from calculating the burden imposed by New York, thereby reducing its Michigan retaliatory tax obligation. On October 25, 2010, the parties stipulated to consolidating related cases involving plaintiffs AIU Insurance Company (AIU) and American Home Assurance Company (AHA). Using the same theory as C&I, AIU sought a tax refund of

$291,686 for tax year 2003, and AHA sought tax refunds for tax years 1995-1998 and 2003.[1]

These consolidated cases involve three separate statutory assessments imposed by New York: a Workers' Compensation Board assessment, which covers the administrative expenses of the board; a Special Disability Fund assessment, which finances a special fund for previously injured workers; and a Reopened Cases Fund assessment, which finances a special fund for certain stale claims filed after a delay. Plaintiffs claimed that these three New York assessments should not be included as part of Michigan's retaliatory tax because they were not burdens on insurance companies doing business in New York. The department, of course, took the opposite view.

Plaintiffs eventually filed a motion for summary disposition. The trial court entered a written opinion and order granting plaintiffs' motion, setting forth two reasons for its decision. First, the trial court concluded that the three assessments were actually imposed on policyholders, not the insurers themselves. The trial court reasoned that the practical effect of the New York schemes was that insurers were ultimately responsible only for the administrative task of remitting to the board the surcharge received from policyholders, so the assessments were not a "burden" on the insurers.

Second, the trial court alternatively concluded that even if the three assessments were "burdens" for pur-

---

[1] At oral argument before this Court, counsel for both sides stated that the tax years at issue are 2002-2003, though plaintiffs' brief indicated that the tax years 1995-1998 were also at issue for AHA. We accept counsels' oral representations that only the 2002-2003 tax years are at issue. See *GMAC LLC v Dep't of Treasury*, 286 Mich App 365, 374-378; 781 NW2d 310 (2009) (indicating that when a taxpayer seeks a tax refund, the version of the tax law then in effect should be applied unless the subsequent amendment has retrospective application).

poses of the retaliatory tax, they were excluded from the retaliatory tax calculation by a separate statute. That statute, the trial court explained, provides that charges in a foreign state "similar" to charges in Michigan for associations or facilities are excluded from the retaliatory tax calculation. MCL 500.134(5). The trial court reasoned that the three assessments were "similar" to those for the Michigan placement facility because the three assessments generally supported the New York workers' compensation system. Accordingly, the trial court granted plaintiffs' motion for summary disposition, and this appeal followed.

## II. ANALYSIS

The standard of review is always a critical aspect of appellate review. Here, this Court "reviews de novo a decision by the Court of Claims on a motion for summary disposition and issues requiring statutory interpretation." *Midwest Bus Corp v Dep't of Treasury*, 288 Mich App 334, 337; 793 NW2d 246 (2010).

### A. RETALIATORY TAX

MCL 500.476a is the codification of Michigan's retaliatory tax and reads, in relevant part, as follows:

(1) Beginning August 3, 1987, whenever, by a law in force outside of this state or country, a domestic insurer or agent of a domestic insurer is required to make a deposit of securities for the protection of policyholders or otherwise, or *to make payment for taxes, fines, penalties, certificates of authority, valuation of policies, or otherwise, or a special burden or other burden is imposed,* greater in the aggregate than is required by the laws of this state for a similar alien or foreign insurer or agent of an alien or foreign insurer, the alien or foreign insurer of that state or country is required, as a condition precedent to its transacting business in this state, to make a like deposit for like purposes

with the state treasurer of this state, and to pay to the revenue commissioner for taxes, fines, penalties, certificates of authority, valuation of policies, and otherwise an amount equal in the aggregate to the charges and payments imposed by the laws of the other state or country upon a similar domestic insurer and the agents of a domestic insurer, regardless of whether a domestic insurer or agent of a domestic insurer is actually transacting business in that state or country. . . .

(2) The purpose of this section is to promote the interstate business of domestic insurers by deterring other states from enacting discriminatory or excessive taxes. [Emphasis added.]

A retaliatory tax is a tax imposed by a state on foreign corporations, usually insurers, when the foreign state imposes a higher aggregate tax burden on actual or hypothetical out-of-state corporations. *TIG Ins Co, Inc v Dep't of Treasury*, 464 Mich 548, 551; 629 NW2d 402 (2001) (*TIG Ins II*). Our Supreme Court has explained:

Under the retaliatory tax, when an insurer's state of incorporation imposes a larger aggregate tax burden on a Michigan insurer doing business in that state than Michigan imposes on a company from that state doing business in Michigan, the foreign insurer must pay Michigan a tax equal to the difference in the aggregate tax burdens. See MCL 500.476a. Thus, to compute the retaliatory tax due from a foreign insurer, if any, Michigan tallies all the taxes, fines, penalties, and other burdens it otherwise imposes on the foreign insurer doing business in Michigan. Michigan then tallies the burden a hypothetical Michigan insurer would pay to that insurer's home state were the hypothetical Michigan insurer doing the same amount of business there. If the other state's total burden on the hypothetical Michigan insurer doing the same amount of business in that state would be larger than the burden Michigan imposed on the foreign insurer, the actual burden Michigan imposes is subtracted from the other state's burden on the

> hypothetical insurer, and the difference is the retaliatory tax the foreign insurer owes Michigan. [*Id.* at 551-552.]

The purpose of a retaliatory tax is to encourage states to impose equal tax burdens on all insurance companies, whether foreign or domestic, thereby promoting interstate business. See MCL 500.476a(2) and *Western & Southern Life Ins Co v State Bd of Equalization of California*, 451 US 648, 670-671; 101 S Ct 2070; 68 L Ed 2d 514 (1981).

In 1988, the Legislature realized that the actual revenue generated from the retaliatory tax as originally enacted by 1987 PA 261 and 262 was less than anticipated because foreign insurers were including assessments paid to private associations and facilities, such as the Worker's Compensation Placement Facility, in calculating their respective Michigan burdens. *TIG Ins II*, 464 Mich at 552-553. As a result, the Michigan burden was higher, and the retaliatory tax paid by the foreign insurers was lower. *Id.* at 553.

The Legislature responded by enacting 1988 PA 349, which "changed the method of calculating the [retaliatory] tax by providing that payments to private insurance associations and facilities are not counted as part of the Michigan burden when calculating retaliatory taxes." *TIG Ins II*, 464 Mich at 553. Accordingly, MCL 500.134 reads, in relevant part:

> (5) Any premium or assessment levied by an association or facility, or any premium or assessment of a similar association or facility formed under a law in force outside this state, is not a burden or special burden for purposes of a calculation under [MCL 500.476a], and any premium or assessment paid to an association or facility shall not be included in determining the aggregate amount a foreign insurer pays to the commissioner under [MCL 500.476a].

(6) As used in this section, "association or facility" means an association of insurers created under this act and any other association or facility formed under this act as a nonprofit organization of insurer members, including, but not limited to, the following:

(a) The Michigan worker's compensation placement facility created under [MCL 500.2301 *et seq.*].

(b) The Michigan basic property insurance association created under [MCL 500.2901 *et seq.*].

(c) The catastrophic claims association created under [MCL 500.3101 *et seq.*].

(d) The Michigan automobile insurance placement facility created under [MCL 500.3301 *et seq.*].

(e) The Michigan life and health insurance guaranty association created under [MCL 500.7701 *et seq.*].

(f) The property and casualty guaranty association created under [MCL 500.7901 *et seq.*].

(g) The assigned claims facility created under [MCL 500.3171].

The entities referred to in MCL 500.134(6)(a) through (g) are essentially associations, organizations, or pools of insurers. See, e.g., MCL 500.2301 and MCL 500.3301. "[P]ayments to these and other similar facilities are not part of the Michigan burden on foreign insurers, and such payments required by other states cannot be considered part of those states' burden when calculating retaliatory taxes." *TIG Ins II*, 464 Mich at 554.

Michigan's retaliatory tax is constitutional. In *TIG Ins II*, our Supreme Court reversed this Court's decision in *TIG Ins Co, Inc v Dep't of Treasury*, 237 Mich App 219; 602 NW2d 839 (1999) (*TIG Ins I*), rev'd 464 Mich 548 (2001), and observed that "the general constitutionality of Michigan's retaliatory tax is clear." *TIG Ins II*, 464 Mich at 557. In doing so, the Court concluded

that MCL 500.134(5) and (6) are rationally related to a legitimate state purpose, i.e., to "pressure [sister] states to relieve the tax burden on Michigan insurers doing business in those states." *Id.* at 559. Excluding payments to certain associations and facilities was "rationally related to a legitimate purpose," *id.* at 561, because by establishing facilities such as the Worker's Compensation Placement Facility, the Legislature could have reasonably believed that it was benefiting insurers by protecting them from insuring "high risk or otherwise uninsurable insureds," *id.* at 560. Further, by enacting MCL 500.134(5) and (6), the Legislature could have reasonably believed that it would encourage sister states to establish comparable facilities, thus protecting insurers in those states as well. *Id.* at 560-561.

### B. NEW YORK LAW

As we have noted, the three separate "assessments" and "surcharges" at issue are meant to cover the costs of the board, NY Workers' Comp 151(2); the Special Disability Fund, NY Workers' Comp 15(8)(h); and the Reopened Cases Fund, NY Workers' Comp 25-a(3).

#### 1. WORKERS' COMPENSATION BOARD CHARGE

In 2002-2003, NY Workers' Comp 151 provided for the imposition of an administrative charge to cover the administrative expenses of the board. See NY Workers' Comp 151(1). Subdivision (2)(a) set forth how to calculate the administrative expenses of the board, NY Workers' Comp 151(2)(a), while subdivision (2)(b) described the imposition of the board charge:

> An itemized statement of the expenses so ascertained shall be open to public inspection in the office of the board for thirty days after notice to the state insurance fund, all insurance carriers and all self-insurers affected thereby,

before *the board shall make an assessment* for such expenses. *The chair shall assess upon and collect a proportion of such expenses as hereinafter provided from each insurance carrier*, the state insurance fund and each self-insurer. [NY Workers' Comp 151(2)(b), as amended by 2000 NY Laws 510 (emphasis added).]

### 2. SPECIAL DISABILITY FUND CHARGE

NY Workers' Comp 15(8) provides for a compensation procedure for workers who suffer a second injury after previously suffering injury in the course of prior employment. See NY Workers' Comp 15(8)(a). The Special Disability Fund is an independent fund designed to eliminate the additional costs associated with hiring a person who has previously suffered injury. See *id*. In 2002-2003, NY Workers' Comp 15(8)(h) set forth the assessment calculation for the Special Disability Fund and described its imposition as follows:

As soon as practicable after [May 1, 1958], and annually thereafter as soon as practicable after January first in each succeeding year, *the chair of the board shall assess upon and collect from all self-insurers, the state insurance fund, and all insurance carriers*, a sum equal to one hundred fifty per centum of the total disbursements made from the special disability fund during the preceding calendar year .... [NY Workers' Comp 15(8)(h), as amended by 2000 NY Laws 510 (emphasis added).]

### 3. REOPENED CASES FUND CHARGE

NY Workers' Comp 25-a provides for a special fund for certain workers who file claims more than seven years after the date of injury. See NY Workers' Comp 25-a(1). In 2002-2003, NY Workers' Comp 25-a(3) set forth the assessment calculation for the Reopened Cases Fund and described its imposition as follows:

Annually, as soon as practicable after January first in each year, the chairman shall ascertain the condition of the fund and whenever the assets shall fall below the prescribed minimum as herein provided *the chairman shall assess and collect from all insurance carriers,* in the respective proportions established in the prior fiscal year under the provisions of [NY Workers' Comp 151] for each carrier, an amount sufficient to restore the fund to the prescribed minimum. . . .

Such assessment and the payments made into said fund shall not constitute an element of loss for the purpose of establishing rates for workers' compensation insurance as provided in the insurance law but shall for the purpose of recoupment be treated as separate costs by carriers. *Carriers shall assess such costs on their policyholders* in accordance with rules set forth by the New York compensation insurance rating board, as approved by the superintendent of insurance. [NY Workers' Comp 25-a(3), as amended by 1993 NY Laws 729 (emphasis added).]

### 4. NY WORKERS' COMP 151(2)(c)

Finally, NY Workers' Comp 151(2)(c) provided in 2002-2003 that insurers must collect these assessments from their policyholders through a surcharge:

Assessments for the special disability fund, the fund for reopened cases and for the operations of the board shall not constitute elements of loss but shall for collection purposes be treated as separate costs by carriers. *All insurance carriers, including the state insurance fund, shall collect such assessments from their policyholders through a surcharge based on premium* in accordance with rules set forth by the New York compensation insurance rating board, as approved by the superintendent of insurance. Such surcharge shall be considered as part of premium for purposes prescribed by law including, but not limited to, computing premium tax . . . . [NY Workers' Comp 151(2)(c), as amended by 2000 NY Laws 510 (emphasis added).]

Thus, each statute specifically provides that the three charges are to be assessed on and collected from insurers like plaintiffs, but that "[a]ll insurance carriers . . . shall collect such assessments from their policyholders through a surcharge . . . ." NY Work Comp § 151(2)(c). In other words, under the plain language of the statutes, there are two separate payments: one from the insurer to the state (the assessment) and another from the policyholder to the insurer (the surcharge). We turn now to see if the New York courts interpret these statutes differently than what the plain language seems to state.

At least one decision by the New York Supreme Court, Appellate Division, suggests that during the relevant time period the "assessments" imposed on insurers for each of these three charges were distinct from the "surcharges" imposed on policyholders. In *In re Selective Ins Co of America v New York Workers' Compensation Bd*, 102 AD3d 72, 73-74; 953 NYS2d 368 (2012), the court introduced the case as follows:

> Petitioners are insurance carriers authorized to provide workers' compensation insurance in New York. Pursuant to the self-supporting mechanism for the workers' compensation system, the Workers' Compensation Board *collects assessments from carriers* in order to fund the Board's administrative and operational expenses (*see* Workers' Compensation Law § 151), the Special Disability Fund (*see* Workers' Compensation Law § 15 [8] [h]) and the Special Fund for Reopened Cases (*see* Workers' Compensation Law § 25-a). *The carriers recover, or offset, these assessments from their insured policyholders through a surcharge*, which is included in the insured's premiums (*see* Workers' Compensation Law §§ 15 [8] [h]; 25-a [3]; 151 [2] [a]). *The assessments charged to the carriers are calculated* by the Board based upon the statutory methodology contained in the Workers' Compensation Law and *without regard to the amount of surcharges collected by the carriers from their*

*policyholders*; the surcharges are computed by the carriers in accordance with rules of the New York Compensation Insurance Rating Board (hereinafter NYCIRB) (*see* Workers' Compensation Law §§ 15 [8] [h]; 25-a [3]; 151 [2] [c]; Insurance Law § 2313 [NYCIRB is a private coalition of carriers licensed to act as a "rate service organization"]). [Emphasis added.]

The court explained that from 2001 to 2009 (which includes the years at issue in our case) "each carrier's assessment was allocated by the Board based upon the carrier's proportionate share of the 'total written premiums' " written in the previous year. *Selective Ins Co*, 102 AD3d at 74. In contrast, "the carriers offset those assessments by collecting surcharges from their policyholders, which were computed based upon 'standard premiums' pursuant to NYCIRB's manual that outlined the methodology for calculating surcharges." *Id*. The court explained that the different methods for calculating assessments and surcharges resulted in some carriers paying more in assessments than they collected in surcharges, whereas other carriers collected more in surcharges than they paid in assessments. *Id*.

In 2009, the New York Legislature amended the workers' compensation law to recalculate the statutory allocation of the three charges. *Selective Ins Co*, 102 AD3d at 74-75. Specifically, the 2009 amendment provided that "assessments, like surcharges, would be allocated based upon a carrier's proportionate share of total 'standard premiums.' " *Id*.

Between 2001 and 2010, the petitioners in *Selective Insurance Co* paid assessments exceeding the surcharges collected in accordance with the proper statutory methods. *Selective Ins Co*, 102 AD3d at 75. After the 2009 amendment was enacted to equalize assessments and surcharges, the petitioners brought suit to recover the "excess" assessments paid to the board

between 2001 and 2009. *Id.* at 75-76. The court ultimately held that the workers' compensation law did not "authorize[] the Board to pay back those carriers for the amount by which their assessments exceeded surcharges collected." *Id.* at 79.

*Selective Ins Co* confirms that, at least during the tax years at issue in our case, the assessments paid by insurers were separate from the surcharges paid by policyholders. For example, in describing the petitioners' assessment/surcharge disparity between 2001 and 2009, the court noted that neither the assessment calculation nor the surcharge calculation guaranteed that assessments would equal surcharges. *Selective Ins Co*, 102 AD3d at 77-78. As a result, neither calculation "connect[ed] *a carrier's liability to the Board for assessments* with that carrier's collection of the same level of funds in surcharges from their policyholders." *Id.* (emphasis added). Additionally, in describing the three charges, the court stated that "*the carrier's obligation to pay assessments to the Board* is not dependent upon the amount of surcharges *separately collected* by that carrier." *Id.* at 79 (emphasis added). *Selective Ins Co* thus establishes that assessments and surcharges are conceptually and legally different, which was especially true before the 2009 amendment, when assessments and surcharges were calculated by entirely different procedures. See, also, *Held v New York Workers' Compensation Bd*, 85 AD3d 35; 921 NYS2d 674 (2011) (suggesting that the assessments for the Workers' Compensation Board charge and the Special Disability Fund charge are imposed directly upon the respective insurers).

Returning to the case at hand, MCL 500.476a(1) provides that the retaliatory tax applies to the extent that a "burden is imposed" on an insurer by a foreign

state. The plain language of the relevant versions of NY Workers' Comp 151(2)(b), NY Workers' Comp 15(8)(h), and NY Workers' Comp 25-a(3) provided that either the chair or the board imposes the assessments on insurers, and then surcharges are placed on policyholders by the insurers so that the insurers can recover what they have paid in assessments. Moreover, New York courts have indicated that the assessments are imposed on the insurers themselves, not the policyholders. *Selective Ins Co*, 102 AD3d at 77-78. Consequently, we hold that the retaliatory tax applies to the entire amount of the assessments placed on insurers under these three statutes.

Plaintiffs argue, citing *First American Title Ins Co v Combs*, 258 SW3d 627 (Tex, 2008), that they are merely a conduit for transmitting the burden actually placed on policyholders. *First American Title Ins Co* provides a good example of a true "conduit" situation, and in doing so highlights why that is not the status of insurers under the New York statutes. In that case, under then-existing Texas law, when an insurer issued a policy through an independent agent, the agent retained 85 percent of the premiums and remitted the remaining 15 percent to the insurer. *Id.* at 629-630. One hundred percent of the premiums were subject to the Texas premium tax, so the agent was liable for 85 percent of the premium tax, and the insurer was liable for 15 percent of the premium tax. *Id.* at 630, 632-633. However, under Texas law the agent did not pay the 85 percent tax obligation directly to the state; rather, the agent paid the tax obligation to the insurer, and the insurer remitted the entire tax obligation to the state. *Id.* at 632-633. The insurers argued that "the full amount of their payment should be included in the retaliatory tax calculation," while the state argued that "because [the insurers] remit[] 85% of the premium tax

to the State as an administrative mechanism and in economic reality bear[] only 15% of the tax burden, the insurer[s] can only include 15% of the tax in [their] calculation of taxes 'directly imposed.' " *Id.* at 633.

The Texas Supreme Court agreed with the state, noting that the relevant law "describes the insurer's role as a pass-through entity relied on by the State to 'facilitate[] the collection of the premium tax' from the insurance agent.' " *First American Title Ins Co*, 258 SW3d at 634, quoting former Tex Ins Code Ann art 9.59, § 8(b).[2] The court explained that "[a]t most, the only compulsion or obligation required of the insurer with regard to 85% of the premium tax is to write a check drawn on money remitted by the agent—at the end of the day, the insurer's bank account is not negatively impacted." *First American Title*, 258 SW3d at 634. The court further explained that the "administrative burden of acting as a conduit for the agents' tax payments does not rise to the level of a 'direct imposition' and therefore cannot be counted as a burden meriting inclusion in the retaliatory tax calculation." *Id.*

Thus, the statutory procedures at issue in *First American Title Ins Co* directly placed a tax burden on title insurance agents (85 percent of the total premium tax). The same statutes required the agents to send those tax monies to the insurer, which would then transmit the agent's tax payments to the state. Here, in contrast, there are two separate charges: the assessment and the surcharge. The assessment is the relevant charge be-

---

[2] Tex Ins Code Ann art 9.59, § 8(b), as amended by 2001 Tex Sess Laws ch 763, provided, in part:

The State of Texas facilitates the collection of the premium tax on the premium retained by the agent by setting the division of the premium between insurer and agent so that the *insurer receives the premium tax due on the agent's portion of the premium and remits it to the State.* [Emphasis added.]

tween the insurer and the state, and the surcharge is the relevant charge between the insurer and the third party. And, as explained by the court in *Selective Ins Co*, during the tax years at issue the assessment and the surcharge were separate amounts determined by separate calculations, which at times resulted in the assessments paid being higher or lower than the surcharges collected. Contrary to the situation in *First American Title Ins Co*, in which the court stated that Texas insurers' accounts would not be negatively affected since the insurers were only acting as a pass-through agent, under the applicable New York law an insurer could—and many did—pay more in assessments to the state than surcharges collected. That process and result is not the same as existed in Texas.

Our decision in *Saginaw Co v John Sexton Corp of Mich*, 232 Mich App 202; 591 NW2d 52 (1998), also offers an example of a true conduit—or pass-through—situation. In that case the local ordinance required landfill operators to collect money from users of the facility. *Id*. at 208. Not surprisingly, we concluded that such a provision merely imposed "a ministerial duty on landfill owners and operators to collect fees payable by those who deposit waste in the landfills." *Id*. Unlike that ordinance, which placed one direct payment obligation on the landfill customer, the New York assessments were directly placed on the insurers, which then separately charged policyholders. The ordinance in *Saginaw Co* was a true pass-through situation; the New York provisions were not.

Accepting plaintiffs' argument—that under the statutory scheme the ultimate burden of the charges is imposed on policyholders—would require disregarding the plain reading of the statutes and ignoring the *Selective Ins Co* decision, which explained that before 2009 assessments and surcharges were separate pay-

ments subject to separate calculations. Additionally, all businesses ultimately pass on tax costs to consumers, so ultimately the consumer is always burdened by the taxes paid to the state. But unquestionably taxes paid by an insurer are part of the retaliatory tax calculation, even though the cost will ultimately be passed on to consumers. That the New York statute makes explicit that this cost (or at least part if it prior to 2009) is ultimately to be passed on to the consumer does not require a different conclusion.[3]

For the reasons expressed, we hold that the trial court erred by concluding that MCL 500.134(5) and (6) operate to exclude the three assessments from the aggregate burdens imposed by New York.

### C. SIMILAR BURDENS

In light of the foregoing conclusion we must now address plaintiffs' alternative argument, accepted by the trial court, that these New York burdens are similar to those charged in Michigan and therefore are not to be included in the retaliatory tax calculations pursuant to MCL 500.134(5).

MCL 500.134(5) provides in part that "any premium or assessment of a *similar association or facility*" of a

---

[3] Plaintiffs argue that imposing the retaliatory tax on the basis of the New York charges would not be consistent with the purpose of the retaliatory tax, which is to deter other states from enacting discriminatory or excessive taxes. Specifically, plaintiffs contend that in operation, Michigan insurers in New York are simply obligated to remit to the state the surcharges received from policyholders, thus incurring a relatively small administrative burden, whereas imposing the retaliatory tax against the *entire amount* of the assessments would effectively result in a much larger burden for the New York insurer in Michigan than is actually imposed in New York. However, the New York insurers can pass these same charges on to the consumer, as would the hypothetical Michigan insurer under these statutes.

foreign state "is not a burden or special burden for purposes of a calculation under [MCL 500.476a] . . . ." Of the three words we have emphasized in the foregoing statutory language, only "similar" is not defined by the Legislature. MCL 500.134(6) defines "association or facility" as "an association of insurers created under this act and any other association or facility formed under this act as a nonprofit organization of insurer members . . . ."[4] "Similar" is commonly understood to mean "having qualities in common[.]" *Random House Webster's College Dictionary* (2001). Thus, under the plain language of MCL 500.134(6), the New York burdens must be imposed by (1) associations or facilities that (2) have qualities in common with the Michigan associations or facilities. Because the New York entities are neither associations of insurers nor groups of insurers, and because the New York and Michigan entities do not share sufficient common qualities, we hold that they are not similar for purposes of MCL 500.134(5).

As noted earlier, by statute the three New York assessments are to be levied by either the board or the chair. During the relevant time NY Workers' Comp 2(2), as amended by 1990 NY Laws 924, provided, in relevant part, that " '[c]hairman' means the chairman of the workmen's compensation board of the state of New York," and " '[b]oard' means the workmen's compensation board of the state of New York[.]" The members of the board are individual persons appointed by the governor of New York. See NY Workers' Comp 140. The chair is a member of the board specifically designated by the governor of New York. See *id*. Neither the chair nor the board is an association or organization of

---

[4] MCL 500.134(6)(a) through (g) contains a nonexhaustive list of associations or facilities and includes the Michigan Worker's Compensation Placement Facility. MCL 500.134(6)(a).

insurers, so the three charges levied by the chair or the board are not "any premium or assessment of a similar *association or facility*" excluded under MCL 500.134(5) and (6).[5] (Emphasis added.)

Additionally, we reject plaintiffs' argument that the assessment by the Michigan Worker's Compensation Placement Facility is similar to the three New York assessments because they have the effect of lowering the costs of otherwise uninsurable persons. See MCL 500.2301.[6] Plaintiffs read the similarity requirement too broadly, as an examination of the purposes of the New York entities reveal that they do not have common qualities with Michigan's placement facility.

The Michigan Worker's Compensation Placement Facility is a nonprofit organization of insurers that was statutorily created to primarily "provide worker's compensation insurance to uninsurable employers and to encourage maximum use of the private insurance system." *Mich Ass'n of Ins Agents v Mich Worker's Com-*

---

[5] Although the department never argued that MCL 500.134(5) and (6) do not apply because neither the chair nor the board is an "association of insurers" or a "nonprofit organization of insurer members," the issue of similarity under MCL 500.134(5) clearly was, and we may decide unraised issues of statutory construction because they involve purely legal issues. See *Prudential Ins Co of America v Cusick*, 369 Mich 269, 290; 120 NW2d 1 (1963).

[6] MCL 500.2301 reads:

Each insurer authorized to write worker's compensation insurance in this state shall participate in the Michigan worker's compensation placement facility for the purpose of doing all of the following:

(a) Providing worker's compensation insurance to any person who is unable to procure the insurance through ordinary methods.

(b) Preserving to the public the benefits of price competition by encouraging maximum use of the normal private insurance system.

*pensation Placement Facility*, 220 Mich App 128, 132; 559 NW2d 52 (1996). The Reopened Cases Fund, however, has no such purpose, as it was created to shift liability for payment of benefits for certain stale cases that were closed and later reopened. See *In re Claim of Early v New York Tel Co*, 57 AD3d 1341, 1343; 870 NYS2d 573 (2008). The Michigan Worker's Compensation Placement Facility does not make benefit payments to claimants or reimbursements to employers, and it does not otherwise specifically deal with formerly closed cases.

Likewise, the Special Disability Fund provides monetary reimbursement to insurers or employers for supplemental benefits paid to certain previously injured workers to help reduce the costs to the current employer. See, generally, *In re Claim of Roland v Sunmark Indus*, 127 AD2d 894, 895; 511 NYS2d 972 (1987). It is not a vehicle which assists employers in obtaining insurance or which promotes the use of the private insurance industry. And, as a result of that conclusion, the fact that one of the many responsibilities of the board is to oversee these funds does not further plaintiffs' argument. The board is also responsible for deciding worker's compensation claims, *LMK Psychological Serv, PC v American Transit Ins Co*, 64 AD3d 752, 754; 882 NYS2d 719 (2009), which of course is an area over which Michigan's worker's compensation placement facility has no jurisdiction. Moreover, plaintiffs have not pointed to any law or regulation that affords the board authority over providing insurance to uninsurable employers or persons.

Finally, plaintiffs' reliance on *TIG Ins I* is in error. First, it was reversed by our Supreme Court. See *TIG Ins II*, 464 Mich at 551, 563. We generally shy away from relying on cases that have been reversed. Second,

and just as importantly, we do not read *TIG Ins I* as providing a broad definition of "similar" under MCL 500.134(5). Indeed, the Court pointed out that the statute does *not* clarify what is a " '*similar* association or facility formed under a law in force outside this state,' " *TIG Ins I*, 237 Mich App at 231, and provides no attempt to define the meaning of the statutory term. Third, what the Court did say was that "[o]n its face" the statute "provides that assessments made to non-profit organizations of insurer members are not burdens, regardless of where those organizations are located." *Id.* And, as we have concluded, one reason why the New York burdens are not precluded from the retaliatory tax calculation is because the funds and the board are not "nonprofit organizations of insurer members" located in New York. Hence, even were *TIG Ins I* a case upon which we could validly rely, it would support our conclusion.

### D. CONSTITUTIONAL ISSUES

Plaintiffs' final argument is that basing the retaliatory tax on the three charges violates the equal protection provisions of the state and federal constitutions. "[R]ational basis review applies in challenges of retaliatory taxes." *TIG Ins II*, 464 Mich at 557; see also *Western & Southern Life*, 451 US at 657. In *TIG Ins II*, our Supreme Court held that the retaliatory tax scheme did not violate the equal protection provisions of the state and federal constitutions. *TIG Ins II*, 464 Mich at 563. Similarly to the situation in *TIG Ins II*, the Legislature could have had the purpose of encouraging foreign states to impose the three charges through separate nongovernmental facilities. A statute subject to rational basis review does not violate equal protection "merely because it may be overinclusive." *People v*

*Derror*, 475 Mich 316, 340; 715 NW2d 822 (2006), overruled in part on other grounds by *People v Feezel*, 486 Mich 184; 783 NW2d 67 (2010).

The retaliatory tax also does not violate the Dormant Commerce Clause, a condition previously set by the United States Supreme Court. *Western & Southern Life*, 451 US at 652-655. The Court explained that the McCarran-Ferguson Act, 15 USC 1011 *et seq.*, "removed all Commerce Clause limitations on the authority of the States to regulate and tax the business of insurance . . . ." *Id.* at 653.

For the reasons expressed in this opinion, we reverse the trial court's order granting plaintiffs' motion for summary disposition and remand for entry of an order granting the department summary disposition. We do not retain jurisdiction.

No costs, an issue of public importance being involved. MCR 7.219(A).

M. J. KELLY, P.J., and CAVANAGH, J., concurred with MURRAY, J.